[ORAL ARGUMENT REQUESTED]
**No. 26-5038**

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

---

OSAGE NATION, a federally recognized Indian tribe,
*Plaintiff-Appellant,*

v.

MARK WOOD, in his official capacity as Chairman of the Oklahoma Tax Commission; SHELLY PAULK, in her official capacity as Vice Chairman of the Oklahoma Tax Commission; and CHARLES PRATER, in his official capacity as Secretary of the Oklahoma Tax Commission, *Defendants-Appellees.*

---

On Appeal from the United States District Court for the Northern District of Oklahoma
No. 4:01-cv-00516-JDR-MTS (Hon. John D. Russell)

---

## BRIEF OF APPELLANT OSAGE NATION

---

Eugene Bertman, OBA #19406
TALLEY, TURNER, STICE & BERTMAN
130 E. Eufaula Street
Norman, Oklahoma 73069
(405) 364-8300
gbertman@ttsblaw.com

Clinton Patterson, OBA #19689
ATTORNEY GENERAL
OSAGE NATION
813 Grandview Avenue
Pawhuska, Oklahoma 74056
(918) 287-5555
cpatterson@osagenation-nsn.gov

Counsel for Appellant Osage Nation

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ....................................................... 1

JURISDICTIONAL STATEMENT ............................................................................. 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................................... 3

STATEMENT OF THE CASE ..................................................................................... 3

INTRODUCTION ....................................................................................................... 8

SUMMARY OF ARGUMENT .................................................................................. 10

STANDARD OF REVIEW ........................................................................................ 13

ARGUMENT ............................................................................................................. 15

I. THE DISTRICT COURT FAILED TO REVIEW THE LAW AND CONSIDER THE ESSENTIAL FACTS THAT ILLUSTRATE APPLYING THE *IRBY* JUDGMENT TO THE NATION'S RESERVATION IS UNJUST AND SHOULD BE VACATED. .......................................................................................................... 15

    A.  Congress Established a Reservation for the Osage ...................................... 18

    B.  Congress Used No Language Evincing the Present and Total Surrender of Tribal Interest in Osage Lands .................................................................... 20

    C. The District Court's Failure To Use Indian Laws of Construction in Its Inquiry Solidifies the Nation's Argument the District Court Abused its Discretion. ................................................................................................... 23

    D.  Any Judgment Terminating Osage Territorial Boundaries Must Rest on Explicit Congressional Language. ............................................................... 24

II.  THE DISTRICT COURT ABUSED ITS DISCRETION IN HOLDING THAT RULE 60(b)(5) IS UNAVAILABLE ABSENT AN ACTIVE INJUNCTION OR CONSENT DECREE. .............................................................................................. 25

    A. The District Court Committed Legal Error by Limiting the Kind of Judgments That Fall Within the Ambit of Rule 60(b)(5) and Disregarding the Text of Rule 60(b)(5). ........................................................................... 25

    B. The District Court Erroneously Relied on Dicta in Cases From Other Jurisdictions Instead of This Court's Rule 60 Jurisprudence in *Repsis I*. .......... 29

    C. The *Twelve John Does Line* of Authority is Inapposite — And, in Any Event, Non-binding. ........................................................................................... 31

D. The District Court's "Alternative Remedies" Rationale is Not a Defense to a Rule 60(b)(5) Motion.................................................................................34

E. The District Court Applied the Wrong Legal Standard.................................35

III.    THE DISTRICT COURT ABUSED ITS DISCRETION IN HOLDING THAT RULE 60(b)(6) DOES NOT AUTHORIZE RELIEF FROM A JUDGMENT BASED ON AN INTERVENING CHANGE IN GOVERNING LAW. ................................36

A. *Elite IT* Does not Require a "Same Transaction or Occurrence" Relationship Between Cases.................................................................................37

B. *Irby* and *McGirt* Address the Same Legal Question Under the Same Legal Framework. ........................................................................................39

C. Whatever *Elite IT* Requires, the Equities Here Amply Meet It. ...................41

IV.    THE *IRBY* JUDGMENT IS IRRECONCILABLE WITH *MCGIRT* AND EXCEEDED THIS COURT'S AUTHORITY. .......................................................42

A. Irby Found no Statutory Text Supporting Disestablishment and Inferred Disestablishment From Extratextual Factors Alone..........................................43

B. *McGirt* Held That What *Irby* Did Is Not Permissible. ..................................45

C. *Irby* Exceeded the Tenth Circuit's Article III Authority..............................45

D. The *Irby* Judgment Cannot be Reconciled With *McGirt* by Limiting *McGirt* to its Facts. .........................................................................................48

V.    THE EQUITIES OVERWHELMINGLY FAVOR VACATUR, AND THIS COURT SHOULD REACH THE MERITS RATHER THAN REMAND. ..............49

A. The Equities Favor Vacatur.........................................................................49

B. The Osage Nation is Entitled to the Same Treatment as Every Other Federally Recognized Tribe in Oklahoma. ........................................................50

C. This Court Should Reach the Merits and Hold That the Osage Reservation has not Been Disestablished.............................................................................51

CONCLUSION.................................................................................................52

CERTIFICATE OF COMPLIANCE..................................................................54

CERTIFICATE OF SERVICE...........................................................................55

ATTACHMENT I - Opinion and Order From the Northern District of Oklahoma dated May, 26, 2026..........................................................................................56

# TABLE OF AUTHORITIES

Cases

*Agostini v. Felton*, 521 U.S. 203 (1997) ................................... 11, 14, 26, 28, 31, 33, 36

*Banister v. Davis*, 590 U.S. 504 (2020) ................................................................... 9

*Bates v. United States*, 522 U.S. 23 (1997) ............................................................ 27

*Bosse v. State,* 484 P.3d 286 (Okla. Crim. App. 2021) ............................................ 7

*Buck v. Davis*, 580 U.S. 100 (2017) .................................................................... 9, 36

*Caribou Four Corners, Inc. v. Truck Insurance Exchange*, 443 F.2d 796 (10th Cir. 1971) ...................................................................................................... 9

*Cashner v. Freedom Stores, Inc.,* 98 F.3d 572 (10th Cir. 1996) .............................. 36

*Castro-Huerta v. Oklahoma*, 597 U.S. 629 (2022) ................................................. 50

*Collins v. City of Wichita*, 254 F.2d 837 (10th Cir. 1958).................................... 37

*Coltec Industries, Inc. v. Hobgood*, 280 F.3d 262 (3d Cir. 2002) .................... 31, 32, 33

*Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429 (10th Cir. 2023)......................................................... 13

*Crow Tribe of Indians v. Repsis*, 2024 WL 1478580 (D. Wyo. Mar. 28, 2024) ... 29, 38, 39, 41

*Crow Tribe of Indians v. Repsis*, 74 F.4th 1208 (10th Cir. 2023) . 2, 11, 14, 29, 30, 31, 36, 38, 39, 41

*Davis v. Kan. Dep't of Corr.*, 507 F.3d 1246 (10th Cir. 2007).................................. 28

*DeCoteau v. District Court*, 420 U.S. 425 (1975) .................................................... 24

*FTC v. Elite IT Partners, Inc.*, 91 F.4th 1042 (10th Cir. 2024).......... 12, 37, 38, 40, 41

*Gonzalez v. Crosby*, 545 U.S. 524 (2005)............................................................... 36

*Grayson v. State*, 485 P.3d 250 (Okla. Crim. App. 2021) ......................................... 7

*Herrera v. Wyoming*, 587 U.S. 329 (2019)............................................... 30, 38, 39, 49

*Horne v. Flores*, 557 U.S. 433 (2009)................................................................... 33

*Jennings v. Rivers*, 394 F.3d 850 (10th Cir. 2005) ...................................................... 14

*Johnson v. Spencer*, 950 F.3d 680 (10th Cir. 2020) ..................................................... 28

*Kirksey v. City of Jackson*, 714 F.2d 42 (5th Cir. 1983) ............................................. 33

*Klapprott v. United States*, 335 U.S. 601 (1949).................................................. 36, 43

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994)......................................... 46

*Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227 (10th Cir. 2016).................... 27

*Logan v. Andrus*, 640 F.2d 269 (10th Cir. 1981) ....................................................... 21

*McCauley v. State*, 548 P.3d 461 (Okla. Crim. App. 2024)....... 7, 25, 33, 34, 38, 48, 51

*McGirt v. Oklahoma*, 591 U.S. 894 (2020)....1, 3, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17,
    18, 21, 22, 23, 24, 27, 35, 38, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 50, 51

*McLane Co., Inc. v. E.E.O.C.*, 581 U.S. 72 (2017)...................................................... 28

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ... 29, 38, 39

*Murphy v. Royal*, 875 F.3d 896 (10th Cir. 2017) ................................... 5, 6, 22, 23, 44

*Murphy v. Sirmons*, 497 F. Supp. 2d 1257 (E.D. Okla. 2007)................................. 5, 6

*Nebraska v. Parker*, 577 U.S. 481 (2016) ............................................................. 6, 21

*Oliver v. City of Shattuck ex rel. Versluis*, 157 F.2d 150 (10th Cir. 1946)............. 8, 35

*Osage Nation v. Irby*, 597 F.3d 1117 (10th Cir. 2010), cert. denied, 564 U.S. 1046
    (2011).1, 2, 3, 4, 6, 7, 9, 10, 12, 14, 15, 16, 17, 18, 21, 22, 24, 26, 30, 32, 34, 35,
    38, 39, 40, 42, 43, 44, 45, 47, 48, 50, 51, 52

*Osage Nation v. Oklahoma ex rel. Okla. Tax Comm'n*, 260 F. App'x 13 (10th Cir.
    2007) ............................................................................................................ 4, 11

*Osage Nation v. Oklahoma*, 597 F. Supp. 2d 1250 (N.D. Okla. 2009) ................... 1, 43

*Picco v. Global Marine Drilling Co.*, 900 F.2d 846 (5th Cir. 1990)....................... 31, 32

*Pierce v. Cook & Co.*, 518 F.2d 720 (10th Cir. 1975) (en banc) ... 10, 11, 13, 28, 36, 37,
    38, 41, 43, 47

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992).................................... 28

*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999)............................................. 46

*Sharp v. Murphy*, 591 U.S. 977 (2020)................................................................ 6, 44

*Sizemore v. State*, 485 P.3d 867 (Okla. Crim. App. 2021) ............................................ 7

*Solem v. Bartlett*, 465 U.S. 463 (1984) ........................ 12, 14, 16, 18, 37, 39, 41, 43, 46

*Spears v. State,* 485 P.3d 873 (Okla. Crim. App. 2021)................................................ 7

*State v. Brester,* 531 P.3d 125 (Okla. Crim. App. 2023) ............................................... 7

*State v. Fuller*, 547 P.3d 149 (Okla. Crim. App. 2024) ................................................ 7

*State v. Lawhorn*, 499 P.3d 777 (Okla. Crim. App. 2021) ............................................ 7

*Twelve John Does v. District of Columbia*, 841 F.2d 1133 (D.C. Cir. 1988) ........ 31, 33

*United States v. Geddes*, 71 F.4th 1206 (10th Cir. 2023) .......................................... 27

*United States v. Torres*, 282 F.3d 1241 (10th Cir. 2002)............................................. 8

*Wilkin v. Sunbeam Corp.*, 405 F.2d 165 (10th Cir. 1968) ........................................ 13

*Yapp v. Excel Corp.*, 186 F.3d 1222 (10th Cir. 1999)................................................ 37

*Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281 (10th Cir. 2005) ................. 14, 35

Statutes

18 U.S.C. § 1151.......................................................................................................... 17

18 U.S.C. § 1152 (General Crimes Act).................................................................... 42

18 U.S.C. § 1153 (Major Crimes Act) ....................................................................... 42

1808 Osage Treaty, 7 Stat. 107 ................................................................................. 18

1818 Osage Treaty, 7 Stat. 183 ................................................................................. 18

1839 Osage Treaty, 7 Stat. 576 ................................................................................. 18

25 U.S.C. § 1304 (Violence Against Women Reauthorization Act) ........................... 42

28 U.S.C. § 1291.......................................................................................................... 2

28 U.S.C. § 2106.................................................................................................... 13, 52

Act of July 15, 1870, ch. 296, § 12, 16 Stat. 335, 362 .............................................. 19

Act of June 5, 1872, ch. 310, 17 Stat. 228...................................................... 5, 19, 52

Act of May 27, 1908, ch. 199, § 1, 35 Stat. 312 ....................................................... 23

Act of Oct. 21, 1978, Pub. L. No. 95-496, § 2, 92 Stat. 1660 ..................................... 20

Creek Allotment Act of 1901, ch. 676, § 7, 31 Stat. 861 ........................................... 23

Okla. Const. art. XVII, § 8 ........................................................................................ 20

Oklahoma Enabling Act, Act of June 16, 1906, ch. 3335, 34 Stat. 267 ......... 16, 20, 21

Osage Allotment Act, Act of June 28, 1906, ch. 3572, 34 Stat. 539 ... 16, 20, 21, 23, 50

Treaty with Cherokee Nation of Indians, July 19, 1866, 14 Stat. 799 ........................ 5

Treaty with the Great and Little Osage, June 2, 1825, 7 Stat. 240 ........................... 18

Treaty with the Osage, Sept. 29, 1865, 14 Stat. 687 ............................................. 5, 18

Tribal Law and Order Act of 2010, Pub. L. No. 111-211, 124 Stat. 2258 ................. 42

U.S. Const. art. III ......................................................................... 12, 43, 46, 47

Rules

Fed. R. App. P. 32(a)(5) ............................................................................................. 54

Fed. R. App. P. 32(a)(6) ............................................................................................. 54

Fed. R. App. P. 32(a)(7)(B) ........................................................................................ 54

Fed. R. App. P. 32(f) .................................................................................................. 54

Fed. R. Civ. P. 59(e) .................................................................................................... 9

Fed. R. Civ. P. 60 ................................................................................................. 24, 26

Fed. R. Civ. P. 60(b)(5) . 1, 2, 3, 10, 11, 15, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 38, 52

Fed. R. Civ. P. 60(b)(6) ................... 2, 3, 10, 11, 12, 15, 36, 37, 38, 41, 43, 47, 48, 52

Rule 60(b) ................................................................... 9, 10, 13, 15, 31, 32, 35, 52

Other Authorities

Advisory Committee Notes to 1937 Adoption of Fed. R. Civ. P. 60 ............................. 9

Advisory Committee Notes to 1946 Amendments to Fed. R. Civ. P. 60 ...................... 9

Barbara Moschovidis, Osage Nation v. Irby: The Tenth Circuit Disregards Legal
    Precedent to Strip Osage County of its Reservation Status, 38 Am. Indian L.
    Rev. 189 (2012) ...................................................................................... 15

Constitution of the Osage Nation (2006) ............................................................. 5, 19

Philip H. Tinker, Is Oklahoma Still Indian Country? 'Justifiable Expectations' and
    Reservation Disestablishment in Murphy v. Sirmons and Osage Nation v.
    Irby, 9 Dartmouth L.J. 120 (2011) ...................................................... 15

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. This appeal presents questions of substantial public importance affecting the Osage Nation's ("Nation") territorial sovereignty, criminal jurisdiction and various other issues. It raises questions of first impression regarding the availability of relief under Rule 60(b)(5) and 60(b)(6) where intervening Supreme Court precedent undermines the legal basis for the prior judgment of this Court in *Osage Nation v. Irby*, 597 F.3d 1117 (10th Cir. 2010) and whether *Irby* can be reconciled with *McGirt v. Oklahoma*, 591 U.S. 894 (2020). Oral argument will materially assist this Court in addressing these issues.

## JURISDICTIONAL STATEMENT

The district court has subject matter jurisdiction over the post-judgment motion by the Nation. The motion, under Fed. Rule of Civil Procedure 60(b), sought relief from the district court judgment in *Osage Nation v. Oklahoma*, 597 F. Supp. 2d 1250 (N.D. Okla. 2009), which this Court affirmed in *Irby*. In affirming the judgment below, this Court inferred Congress had disestablished the Nation's Reservation ("Reservation") on the basis of surrounding circumstances and subsequent events despite no congressional language explicitly changing

1

boundaries. *Irby*, 597 F.3d at 1122. Following remand, the district court entered judgment on behalf of Oklahoma Tax Commission ("OTC") against the Nation, effectively granting declaratory judgment in favor of OTC.[1] The Nation's Petition for Certiorari was denied June 27, 2011. *Osage Nation v. Irby*, 564 U.S. 1046 (2011). The Tenth Circuit's Mandate issued thereafter.

The district court's jurisdiction to review unjust judgments through Rule 60 (b) motions is broad. See *Crow Tribe of Indians v. Repsis*, 74 F.4th 1208, 1211 (10th Cir. 2023)("*Repsis I*"). Its authority is not hindered by procedure. It can grant post-judgment relief under Rule 60(b)(5) even if it has no "ongoing managerial role in the judgment." It is "permitted" to grant relief from unjust judgments under Rule 60(b)(6) for a wide-array of reasons, and a change in the governing law is only one of them. Doc.

The district court's Opinion and Order is a final order and this Court has jurisdiction to review it under 28 U.S.C. §1291.

The final Opinion and Order was filed March 2, 2026. The Nation's Notice of Appeal was filed March 30, 2026, and the Docketing Statement was filed April 15, 2026. This appeal is timely.

---

2

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I. Whether the equities favor vacatur of the *Irby* judgment when the district court did not believe it had authority to apply *McGirt* to reach the merits of whether Congress disestablished the Osage Reservation.

II. Whether the district court abused its discretion in holding that Rule 60(b)(5), reason [iii], is unavailable to vacate a judgment with ongoing prospective preclusive effect, on the ground that the judgment does not include an active injunction or consent decree.

III. Whether the district court abused its discretion by holding Rule 60 (b) (6), which is meant as a catch-all provision that applies to any extraordinary cases, such as this one, prevents the district court from granting relief from a judgment based on intervening law.

IV. Whether the *Irby* judgment exceeded the Court's authority and is irreconcilable with *McGirt*, where *Irby* inferred disestablishment of the Reservation from extratextual evidence after finding no statutory text supporting disestablishment, thus exceeding the judicial power Article III confers and accomplishing judicially what only Congress may do.

V. Whether this Court should reach the merits instead of remanding to the district court.

## STATEMENT OF THE CASE

This case's history spans more than twenty-five years. It began as a case with limited impact, potentially affecting only Osage citizens employed by the Nation on trust land and living within the boundaries of the Nation's Reservation. *Irby*, 597 F.3d at 1121. In 2001, following denial of an individual protest, the Nation sued to enjoin OTC from taxing the personal income of Osage citizens who both reside and work

within Reservation boundaries. Doc. 1 (App. 0021, Original Complaint). OTC filed an interlocutory appeal on Eleventh Amendment grounds after the district court denied the OTC motion to dismiss. In *Osage Nation v. Oklahoma ex rel. Okla. Tax Comm'n*, 260 Fed. Appx. 13, 22 (10th Cir. 2007) this Court concluded the suit could proceed because the relief sought was properly characterized as "prospective" in both "caption" and "substance."

In 2008 the Nation amended its Complaint and informed the court of Congress's reaffirmance of the Nation's inherent sovereignty and its rights of self-government. Doc. 70 ¶ 15 (App. 0033, Amended Complaint) The Nation's membership changed to include all Osages. Doc. 70 ¶ 10 (App. 0033) and not just Osage citizens who held shares of the mineral estate, known as "headrights." The Nation's new Constitution affirmed its sovereign territory:

> Section 1. Territory: The territory of the Osage Nation shall include the Osage Reservation, duly established by the Congress of the United States pursuant to (1) the Treaty between the United States of America and the Great and Little Osage Indians, Sept. 29, 1865, 14 Stat. 687; (2) Article 16 of the Treaty between the United States of America and the Cherokee Nation of Indians, July 19, 1866, 14 Stat. 799; and (3) the Act of June 5, 1872, ch. 310, 17 Stat. 228 (An Act to Confirm to the Great and Little Osage Indians a Reservation in the Indian Territory), and all other lands

4

under federally-restricted status title to which is held by the Nation or the People, or by the United States in trust on behalf of the Nation or the People, and any such additional lands as are hereafter acquired and similarly held by the Nation or the People or by the United States on behalf of the Nation or the People. Territory is defined as, but is not limited to, air, water, surface, sub-surface, natural resources and any interest therein, notwithstanding the issuance of any patent or right of way in fee or otherwise, by the governments of the United States or the Osage Nation, existing and/or in the future.

Doc. 70-1 (App. 0040, 2006 Constitution).

Following the appeal, the district court converted OTC's Motion to Dismiss to a Motion for Summary Judgment and granted it, holding the Reservation ceased to exist a century ago. The district court relied extensively on false assumptions that there were no Reservations in Oklahoma and on opinions from "historians" whose "reports" were not contemporaneous with allotment and statehood. Doc. 113 at 8, 14–16 (App. 0094, 0100–0102). The district court emphasized both the language and result in *Murphy v. Sirmons*, 497 F. Supp. 2d 1257 (E.D. Okla. 2007) (concluding the Muscogee (Creek) Reservation had been disestablished and there were no Reservations in Oklahoma). *Cf. Murphy v. Royal*, 875 F.3d 896, 966 (10th Cir. 2017), aff'd sub nom *Sharp v. Murphy*, 591 U.S.

5

977 (2020) (concluding Congress had not disestablished the Creek Reservation).

*Sirmons* was reversed in 2017– three years before *McGirt* was decided. In dicta the *Irby* Court stated that the allotment process with the Five Tribes[2] had "disestablished the Creek and other Oklahoma reservations." *Irby*, 597 F.3d at 1124. *Cf. Murphy*, 875 F.3d at 954 n.63 (noting this Court "referred in passing" to the Creek Reservation as disestablished and recognizing *Irby* relied on "step two evidence" to determine Osage Reservation had been disestablished "despite an absence of clear textual evidence.") *Id.* at 954.[3]

*McGirt*, perhaps the most consequential case of federal Indian law in decades, blew up long-held jurisdictional assumptions proliferating in Oklahoma since statehood. *McGirt* categorically confirmed there *are* Indian Reservations in Oklahoma and the treaty rights of Oklahoma's

---

[3] Neither the district court nor this Court had the benefit of *Nebraska v. Parker*, 577 U.S. 481, 489, 492 (2016) (finding reservation boundaries are not diminished if congressional acts bear "no hallmarks of diminishment" even when subsequent jurisdictional history indicates Tribe almost "entirely absent from the disputed territory for more than 120 years"), *McGirt,* 591 U.S. at 924 (finding only Congress has the constitutional power to disestablish reservations) and *Sharp*, 591 U.S. at 977 (affirming *Murphy* for reasons stated in *McGirt*).

federally recognized tribes *are* intact. *McGirt* clarified that reservations cannot be disestablished by courts or states wishing it so, or expecting it to be so. *See McGirt*, 591 U.S. at 903.

On January 2, 2025, the Nation, through Rule 60(b), sought relief from the *Irby* judgment. Doc. 148 (App. 0141). The Motion was filed after the Oklahoma Court of Criminal Appeals ("OCCA") refused to conduct a *McGirt* analysis of the Nation's Reservation status in a major crime act case. See *McCauley v. State*, 548 P.3d 461 (Okla. Crim. App. 2024).

The district court denied the Nation's Motion on March 2, 2026. The court recognized that "the legal landscape has shifted dramatically" and that other courts, applying *McGirt*, recognize the continued existence of other Oklahoma Reservations. Doc. 172 at 1-2 (App. 0255–0256). These Oklahoma tribes asserted the very same claim the Nation raised in *Irby*. Yet the Nation is the only federally recognized tribe in Oklahoma to have been denied a merits application of *McGirt* to its Reservation.[4]

---

[4] *Cf. State v. Fuller,* 547 P.3d 149 (Okla. Crim. App. 2024) (Wyandotte Reservation); *State v. Brester*, 531 P.3d 125 (Okla. Crim. App. 2023) (Ottawa and Peoria Reservations); *State v. Lawhorn,* 499 P.3d 777 (Okla. Crim. App. 2021) (Quapaw Reservation)*; Spears v. State*, 485 P.3d 873 (Okla. Crim. App. 2021) (Cherokee Reservation); *Sizemore v. State,* 485 P.3d 867 (Okla. Crim. App. 2021) (Choctaw Reservation); *Grayson v. State*, 485 P.3d 250 (Okla. Crim. App. 2021) (Seminole Reservation); *Bosse v. State,* 484 P.3d 286 (Okla. Crim. App. 2021) (Chickasaw Reservation), vacated on other grounds, 499 P.3d 771 (Okla. Crim. App. 2021).

## INTRODUCTION

Rule 60 was first approved in 1937 by the Supreme Court and passed into law. It statutorily affirmed "ancient precepts" of federal courts' inherent power to vacate or grant relief from final judgments. The statutory rule supplanted various extraordinary writs and established a procedure that offered relief from unjust judgments, even when the unfairness arose from matters that occurred after judgment was rendered. *Oliver et. al. v. City of Shattuck ex rel. Versluis*, 157 F.2d 150 (10th Cir. 1946) (finding the now Rule 60 supplanted extraordinary writs in favor of a "more simple and expeditious motion," that offered the same flexibility as the common law writs.) Rule 60 applies to judgments that were infirm when issued for reasons that later came to light (Coram Nobis), *see e.g. United States v. Torres*, 282 F.3d 1241, n.6. (10th Cir. 2002)(Discussing Coram Nobis), and to judgments that were correct when rendered but where matters arising after rendition caused the judgment to be contrary to justice (Audita Querala). *Oliver*, 157 F.2d at 153. *See also* Advisory Committee 1937 Notes on Fed. Rule Civ. Procedure 60; Advisory Committee 1946 Notes on Amendments to Fed. Rule Civ. Proc. 60. Rule 60 (b) codified writs long used to seek relief from

8

unjust judgments even after an appeal had long since concluded. *Banister v. Davis*, 590 U.S. 504, 517-20 (2020) (comparing Rule 59(e) and Rule 60(b) in habeas case). Rule 60(b) can provide a route to a merits determination even when intervening Supreme Court changed only the law regarding procedural default  which had been an obstacle to a merits determination. *Buck v. Davis*, 580 U.S. 100, 126-127 (2017).

Rule 60 (b) is to "be construed liberally to serve the interest of justice." *Caribou Four Corners, Inc. v. Truck Insurance Exchange*, 443 F.2d 796, 799 (10th Cir. 1971). The district court did not believe the Rule gave it the equitable power to relieve the Nation from the 2010 judgment in *Irby*. It denied the motion without analyzing the *Irby* judgment on the merits to determine whether it was irreconcilable with *McGirt*.

Despite recognizing *McGirt* caused a dramatic shift in the legal landscape in Oklahoma, the court never analyzed or addressed the unfairness of the judgment that disestablished the Reservation for all times and all purposes. Instead, it focused on strict and narrow interpretations of Rule 60 (b) to procedurally avoid the merits.

Rule 60(b) is the correct vehicle to prevent further injustice and it serves the interests of both parties and judicial economy. The Nation

simply asks that *McGirt* be applied to the Nation's Reservation, as it has in all other reservation cases.

## SUMMARY OF ARGUMENT

The Nation seeks relief from this Court's 2010 decision in *Irby*, 597 F.3d 1117, under Federal Rule of Civil Procedure 60(b)(5) and (b)(6). The Supreme Court's intervening decision in *McGirt* has fundamentally changed the legal framework governing disestablishment. *Irby* cannot survive *McGirt*. The district court did not address that incompatibility; it ruled only on procedural threshold grounds. That ruling was an abuse of discretion.

I.      The district court erred by refusing to apply *McGirt* to the merits. Rule 60(b) requires courts to consider whether a judgment, examined in light of currently governing law, is unjust. *Pierce v. Cook & Co.*, 518 F.2d 720, 722 (10th Cir. 1975). The district court did not assess whether *Irby* — which inferred disestablishment from extratextual evidence after finding no statutory text of disestablishment — could survive *McGirt*'s holding that "[c]ourts have no proper role in the adjustment of reservation borders." *McGirt*, 591 U.S. at 903. Had the

10

court done so, the Reservation's continued existence would have been confirmed.

II.   Rule 60(b)(5), reason [iii], reaches any final judgment whose "prospective application" works manifest injustice in light of intervening Supreme Court precedent. The Rule's text — "no longer equitable" — does not require an active injunction, a consent decree, or any ongoing managerial role. The district court grafted those requirements onto Rule 60(b)(5). That contradicted this Court's controlling decision in *Repsis I* considered with the Supreme Court's decision in *Agostini v. Felton*, 521 U.S. 203 (1997). *Irby* has ongoing prospective effect — this Court itself recognized as much in the 2007 interlocutory ruling holding that the relief sought is "prospective" in both "caption" and "substance." *Osage Nation v. Oklahoma ex rel. Okla. Tax Comm'n*, 260 F. App'x 13, 22 (10th Cir. 2007).

III.   Rule 60(b)(6)'s "grand reservoir of equitable power" supplies relief when an intervening Supreme Court decision changes the law applicable to a final judgment. *Pierce*, 518 F.2d at 722. The district court read *FTC v. Elite IT Partners, Inc.*, 91 F.4th 1042 (10th Cir. 2024), to bar 60(b)(6) relief unless the underlying and intervening cases share "the

11

same transaction or occurrence." That misreads *Elite IT*. The case can be understood to provide relief where there is a shared legal question in a factually related case, not identical statutes or parties. This is consistent with this Court's Ruling in *McGirt* and *Irby*. Both applied *Solem v. Bartlett*, 465 U.S. 463 (1984). Both address whether a tribe in former Indian Territory retains its reservation after allotment-era legislation. Both turn on the role of extratextual evidence in disestablishment analysis. They are factually related in every sense that matters.

IV.    Rule 60(b)(6)'s "grand reservoir of equitable power" supplies relief when *Irby* is irreconcilable with *McGirt* on the merits and exceeded this Court's Article III authority. *Irby* found no statutory text supporting disestablishment and inferred disestablishment from extratextual factors alone — historian opinions, post hoc statements, demographic changes. *McGirt* held that approach is impermissible. "[T]here is only one place we may look: the Acts of Congress." 591 U.S. at 903. A federal court that performs the disestablishment Congress declined to do exceeds the judicial power Article III confers.

V.    The equities overwhelmingly favor vacatur. *Irby* governs criminal jurisdiction, federal program eligibility, and the Nation's

12

authority over its 1.4-million-acre Reservation. The Osage Nation stands alone among Oklahoma tribes whose reservations have been litigated post-*McGirt* in being denied a merits application of the controlling framework. Because the merits question is purely legal and the record is fully developed, this Court should exercise its power under 28 U.S.C. § 2106 to enter relief from the judgment that Congress has not disestablished the Osage Reservation, rather than remanding.

## STANDARD OF REVIEW

District courts are generally in a better position to pass on issues presented in post-judgment Rule 60(b) motions. *Wilkin v. Sunbeam Corp.*, 405 F.2d 165, 166 (10th Cir. 1968). Rule 60(b) provides district courts with "a grand reservoir of equitable power to do justice in a particular case." *Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429, 446 (10th Cir. 2023). The Rule must be liberally construed even if district courts can "well believe that [they are] without power to determine a legal question contrary to the decision of the Court of Appeals." *See Pierce*, 518 F.2d at 722.

13

This Court reviews an order denying a post-judgment motion for abuse of discretion. *Jennings v. Rivers*, 394 F.3d 850, 854 (10th Cir. 2005). The "district court necessarily abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Zurich N. Am. v. Matrix Serv., Inc.*, 426 F.3d 1281, 1289 (10th Cir. 2005) (internal quotation omitted). *See also Agostini*, 521 U.S. at 215 (finding exercise of discretion cannot be permitted to stand if it rests on a legal principle that can no longer be sustained). It also abuses its discretion if it determines it lacks authority to grant relief by denying such motions when it does not act with the authority it has been vested with. *See Repsis I*, 74 F.4th at 1219.

The district court here determined its authority was limited. It did not assess the nature of the judgment in *Irby*. It did not assess whether the judgment in *Irby* rested on legal principles from *Solem* as upended in *McGirt*. It assessed no evidence of the Nation's treaties and legal history that establish the Nation's Reservation is intact. It did not assess whether the judgment in *Irby* was irreconcilable with *McGirt*.

The district court applied an erroneous view of the law and abused its discretion by denying the Nation's motion as "procedurally improper."

14

Doc. 172 at 8 (App. 0262). It erroneously concluded that it "may not grant the Osage Nation relief from Judgment" because the Nation's Rule 60(b)(5) argument applies only to judgments involving active injunctions or consent decrees and its Rule 60(b)(6) argument does not permit relief based on a change in governing law.

## ARGUMENT

### I. THE DISTRICT COURT FAILED TO REVIEW THE LAW AND CONSIDER THE ESSENTIAL FACTS THAT ILLUSTRATE APPLYING THE *IRBY* JUDGMENT TO THE NATION'S RESERVATION IS UNJUST AND SHOULD BE VACATED.

The very purpose of Rule 60(b) is to provide relief from unjust judgments, whether the judgment was unjust at the time it was rendered, s*ee* Barbara Moschovidis, Osage Nation v. Irby: *The Tenth Circuit Disregards Legal Precedent to Strip Osage County of its Reservation Status*, 38 Am. Indian L. Rev. 189 (2012) and Philip H. Tinker, *Is Oklahoma Still Indian Country? "Justifiable Expectations" and Reservation Disestablishment in* Murphy v. Sirmons *and* Osage Nation v. Irby, 9 Dartmouth L.J. 120 (2011), or whether it is unjust now because a post-judgment matter–here, the dramatic and far-reaching decision in *McGirt*–undermined the very foundation upon which the judgment rests. The district court's Rule 60 analysis did not look at the law and facts that

15

formed the *Irby* judgment. It entertained no evidence to analyze the Nation's reservation status in light of the changed law. By not reviewing the law and facts that formed the judgment to begin with, the district court took an erroneous view of the law that cannot be sustained. The district court basically concluded that it did not matter whether *Irby* was irreconcilable with *McGirt* because the Nation could not procedurally meet narrow court-created strictures.

First, had the district court analyzed the basis for *Irby* judgment under the *McGirt* lens, it would have confirmed, as this Court did in *Irby*, that there is no text in any Treaty or any Act of Congress that explicitly disestablishes the Nation's Reservation. Second, it would have recognized this Court impermissibly inferred disestablishment without finding explicit text in either the Osage Allotment Act, Act of June 28, 1906, ch. 3572, 34 Stat. 539 ("OAA"), or the Oklahoma Enabling Act, Act of June 16, 1906, ch. 3335, 34 Stat. 267 ("OEA"). Third, it would have learned that such inferences, presumed by this Court in *Irby* to be permissible under *Solem*, are not allowed by *McGirt*.

Only Congress has the authority to disestablish the Nation's Reservation. Courts are not free to infer disestablishment from history

16

and the whims and expectations of some members of Congress, or from noncontemporary reports from historians announcing there are no Indian reservations in Oklahoma. "[C]ourts have no proper role in the adjustment of reservation borders." *McGirt*, 591 U.S. at 903. "To determine whether a tribe continues to hold a reservation, there is only one place [to] look: the Acts of Congress." *Id.*

Last, the district court did not seriously consider the impact the *Irby* judgment has on the Nation's sovereign authority—particularly its law enforcement authority and its mission to assure public safety for all the people in the Reservation. The profound and direct impact on the Nation cannot be overstated. Although the district court did not dismiss these concerns as insignificant, it inexplicably determined the Nation's sovereignty concerns did not "implicate Rule 60." Doc. 172 at 8 (App. 0262).

This Court should return the case to the district court to follow *McGirt* and make a de novo determination of the merits of whether the Nation's Reservation remains Indian country under 18 U.S.C. §1151(a). *McGirt* teaches that "[e]ach Tribe's treaties must be considered on their

17

own terms." *McGirt*, 591 U.S. at 932. And that is what the Nation asked the district court to do.

The Nation will compare the analytical structure from *Solem* this Court used in *Irby,* with the cleaner and simpler analytical structure *McGirt* now requires. *See Solem,* 465 U.S. at 470; *Irby*, 597 F.3d at 1122 ("We apply the three-part test summarized in *Solem* to determine whether a reservation has been diminished or disestablished"). That comparison reveals the Nation's Reservation has not been disestablished by Congress.

## A.  Congress Established a Reservation for the Osage.

Through the early nineteenth century, the Osage Nation exercised sovereignty over a vast territory encompassing areas of what are now Arkansas, Kansas, Louisiana, Missouri, and Oklahoma. As migrants from other tribes and non-Indian settlers pressed into Osage territory, the United States made a series of promises — many unfulfilled — in treaties dating from 1808 to 1865 that it would curb the incursions in exchange for land cessions. *See* 1808 Osage Treaty, 7 Stat. 107; 1818 Osage Treaty, 7 Stat. 183; 1825 Osage Treaty, 7 Stat. 240; 1839 Osage Treaty, 7 Stat. 576; 1865 Osage Treaty, 14 Stat. 687. In the 1865 Treaty,

18

the Nation agreed to cede much of its remaining territory in exchange for a cash payment held in trust by the United States and the United States' promise to continue to reserve the Nation's remaining territory in Kansas. 14 Stat. 687.

Only a few years later, in 1870, the United States urged the Nation to make another cession. Congress provided for the Nation to cede its Kansas reservation and remove to a "permanent home" in what is now Oklahoma, purchasing the new lands with proceeds from the 1865 sale. Act of July 15, 1870, ch. 296, § 12, 16 Stat. 335, 362. The Nation agreed, and two years later Congress confirmed that the new reservation — the present Osage Reservation — was "hereby set apart for and confirmed as [the Osage Nation's] reservation." Act of June 5, 1872, ch. 310, 17 Stat. 228, 229.

On that Reservation the Nation has continuously exercised sovereignty. In 1881, the Nation adopted a written constitution providing for a three-branch separation-of-powers government. The Nation today administers its own civil and criminal laws on the Reservation, operates its own police department, and provides education, health, and housing services. Doc. 70-1 (App. 0040, 2006 Constitution).

19

**B. Congress Used No Language Evincing the Present and Total Surrender of Tribal Interest in Osage Lands.**

When Congress enacted the OEA, it expressly recognized "the Osage Indian Reservation," § 2, 34 Stat. at 268, and required the constitutional convention to "constitute the Osage Indian Reservation a separate county" within the new State, § 21, 34 Stat. at 277. That status persists today: "[t]he Osage Indian Reservation with its present boundaries is hereby constituted one county to be known as Osage County." Okla. Const. art. XVII, § 8.

Twelve days later, Congress enacted the OAA. The OAA allotted most Reservation land in 160-acre homestead and surplus-land parcels to enrolled Nation members. § 2, ¶¶ 4, 5, 7, 34 Stat. at 540-42. Homestead parcels were "inalienable and nontaxable" for the life of the allottee or at minimum twenty-five years. *Id.* The OAA reserved to the Nation as a whole — initially for twenty-five years, later extended in perpetuity — all mineral rights underlying the Reservation, with leases made by the Osage Tribal Council subject to Secretarial approval. § 3, 34 Stat. at 543-44; *see* Act of Oct. 21, 1978, Pub. L. No. 95-496, § 2, 92 Stat. 1660.

The OAA expressly preserved the Nation's authority to govern itself by affirming the general tribal authority of the Osage Tribal Council. § 9,

20

34 Stat. at 545; *Logan v. Andrus*, 640 F.2d 269, 270 (10th Cir. 1981). And the Act acknowledged the continued existence of the Reservation throughout its operative provisions — establishing a school fund "for the support of the Osage Boarding School and for other schools on the Osage Indian Reservation," § 4, ¶ 3, 34 Stat. at 544 (emphasis added); regulating "public highways or roads" within "the Osage Indian Reservation," § 10, 34 Stat. at 545 (emphasis added); and preserving Osage mineral rights within "said lands." § 11, 34 Stat. at 545.

What is conspicuously absent from the OEA and the OAA is any language of disestablishment or diminishment. There is no "cession or other language evidencing the present and total surrender of all tribal interests." *McGirt*, 591 U.S. at 904 (quoting *Parker*, 577 U.S. at 488). None of the typical indicators of disestablishment is present: nearly the entire Reservation was reserved for allotment to Osage members, no surplus lands were set aside for non-Indian settlement, and no sum-certain was paid to the Nation as is customary when tribes cede lands. *See Irby*, 597 F.3d at 1124. In *Irby* itself this Court acknowledged that "the operative language of the statute[s] do[] not unambiguously suggest diminishment or disestablishment of the Osage reservation." *Id.*

21

*McGirt* does not require a particular form of words, but it does require clear expression, commonly with explicit reference to cession or other language of present and total surrender of all tribal interest. *McGirt*, 591 U.S. at 904. This Court recognized there was no such clear expression in "the Osage Allotment Act []or the Enabling Act." *Irby*, 597 F.3d at 1124. In *Murphy* this Court confirmed that finding and recognized "an absence of clear textual evidence." *Murphy*, 875 F.3d at 954, n.63. The *Murphy* Court remarked that the "absence of such language is notable because Congress is fully capable of stating its intention to disestablish." *Murphy*, 875 F.3d at 948. *See also McGirt*, 591 U.S. at 904 ("History shows that Congress knows how to withdraw a reservation when it can muster the will"). Earlier treaties with the Creeks had clear congressional expressions of disestablishment. *Murphy*, 875 F.3d at 949–50 (finding Congress had no difficulties addressing boundaries in the 1826, 1832, 1833, 1856, and 1866 Creek treaties); *McGirt*, 591 U.S. at 906 ("Without doubt, in 1832 the Creek 'cede[d]' their original homelands east of the Mississippi for a reservation promised in what is now Oklahoma. And in 1866, they 'cede[d] and convey[ed]' a portion of that reservation to the United States. But because there exists

no equivalent law terminating what remained, the Creek Reservation survived allotment.") (internal citations omitted) (emphasis added). Just as the Creek Reservation survived allotment, so did the Osage.

The Osage allotment provisions are, if anything, more protective of Reservation integrity than the Creek provisions *McGirt* held insufficient to effect disestablishment. The Osage homestead restrictions (160 acres, inalienable for life or 25 years) were more stringent than the Creek (40 acres, inalienable for 21 years). *Compare* OAA § 2, ¶¶ 4, 7, 34 Stat. at 541-42, *with* Creek Allotment Act of 1901, ch. 676, § 7, 31 Stat. 861, 863. The 1908 statute that loosened Creek alienation restrictions, Act of May 27, 1908, ch. 199, § 1, 35 Stat. 312, was not applied to the Osage. And the long-term reservation of the entire mineral estate to the Nation as a whole — negotiated by the Osage to reinforce its continuing sovereignty — has no analog in the Creek legislation.

## C. The District Court's Failure To Use Indian Laws of Construction in Its Inquiry Solidifies the Nation's Argument the District Court Abused its Discretion.

Layered on top of the rules courts must follow generally when reviewing congressional text is the special rule in diminishment or disestablishment cases. *See Murphy*, 875 F.3d at 921 (finding " ' rule by

23

which legal ambiguities are resolved to the benefit of the Indians' is applied to its 'broadest possible scope' in disestablishment and diminishment cases") (citing internal *DeCoteau v. District Court,* 420 U.S. 425, 444, 447 (1975). The Nation asserts that, as with the Creek, there are no ambiguities in the OEA or OAA, and this Court identified no ambiguities. Thus, the *Irby* Court's sole reliance on extratextual matters to conclude the Reservation was disestablished cannot be squared with *McGirt.* The district court was obliged to decide the merits in order to determine whether relief should have been granted from a judgment that was inapposite to that in *McGirt.*

**D.    Any Judgment Terminating Osage Territorial Boundaries Must Rest on Explicit Congressional Language.**

Territorial boundaries are an existential concern for the Osage. Rule 60 was enacted to assure that unjust judgments, including those involving wrongful dissolution of territorial boundaries, would not have continuing force and effect. By not analyzing the *Irby* judgment and *McGirt*'s impact on it, the district court diminishes the Osage's long

association with the land on which its Oklahoma reservation was established. [5]

## II.    THE DISTRICT COURT ABUSED ITS DISCRETION IN HOLDING THAT RULE 60(b)(5) IS UNAVAILABLE ABSENT AN ACTIVE INJUNCTION OR CONSENT DECREE.

The district court denied relief under Rule 60(b)(5) on a single ground: that this case "is not a case involving ongoing Court-ordered relief." The district court concluded that relief from a judgment under 60(b)(5) was not procedurally possible unless there was an active injunction, consent decree, or continuing managerial role of the court. Doc. 172 at 4-5 (App. 0258–0259). The court read Rule 60(b)(5), reason [iii], to apply only where the original judgment compels future conduct. *Id*. at 2-5. That is not the law.

## A. The District Court Committed Legal Error by Limiting the Kind of Judgments That Fall Within the Ambit of Rule 60(b)(5) and Disregarding the Text of Rule 60(b)(5).

Rule 60(b)(5) authorizes relief where "applying [the judgment] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Rule is

---

[5] The Nation's history has been set out thoroughly in a prior Amicus Brief and Appendix filed in the *McCauley* case in state court. The history was reported in greater detail in the Declaration of Academic historian Professor Kathleen DuVal (Declaration and Report of Kathleen DuVal, Ph. D) and the Declaration of Professor Lindsay G. Robertson (Declaration and Report of Lindsay G. Robertson, M.A.(History), J.D., Ph. D (History), M.A. (Native American Studies).

written in the disjunctive and by its plain terms does not require an "active injunction," a "consent decree," or any ongoing managerial or supervisory role by the court. Yet the district court strictly limited the ambit of Rule 60 to just such cases. There is nothing in the text that requires applying limitations the district court imposed. There is nothing in the history of the writs on which Rule 60 was based that suggest these limitations. The district court was charged with determining whether continuing to apply the *Irby* judgment prospectively, in light of changed law or changed circumstances, is "equitable." The district court never used its equitable power.

The Supreme Court's controlling decision holds that Rule 60(b)(5) reaches any judgment whose "prospective application" works a manifest injustice in light of intervening Supreme Court precedent. *Agostini,* 521 U.S. at 215, 236-37. (1997). The district imposed phrases onto the Rule to conclude only cases with "active injunctions or court intervention," "consent decrees regulating ongoing behavior," or a court's "ongoing managerial role" or "supervision," fall within the ambit of Rule 60. These limitations on relief are judicial creations applied in very specific kinds of cases with specific equities. They are not the words of the Rule.

The Rule itself is plain: a court "may relieve a party … from a final judgment" when "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). That is the text. By grafting a managerial-role requirement Congress did not write, the district court did what *McGirt* warns against. It changed the statute Congress wrote, substituting its own notion of when relief should be available for what the text says is available. *See McGirt*, 591 U.S. at 924, 903 (describing what is permitted in any area of statutory interpretation and concluding "there is only one place we may look: the Acts of Congress."). That command is not unique to Indian law. The Supreme Court has long instructed that courts must "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997). This Court has applied the same canon to reject judicial additions to federal statutes. *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1232-233 (10th Cir. 2016) (quoting *Bates*). It has likewise refused to enforce written terms a court added that were not part of the operative pronouncement. *See United States v. Geddes*, 71 F.4th 1206, 1213–17 (10th Cir. 2023) (district court abused its discretion by adding discretionary conditions to the written judgment that were not orally pronounced). The principle

27

cuts the same way under Rule 60(b)(5): the district court cannot supply terms — "active injunction," "consent decree," "ongoing managerial role" — that the lawmakers did not write.

Abuse of discretion does not shelter a district court that makes an error of law. *Johnson v. Spencer*, 950 F.3d 680, 701(10th Cir. 2020)(citing *McLane Co., Inc. v. E.E.O.C.*, 581 U.S. 72, 81 n.3 (2017)). The consequence of the district court's judicial gloss is to substitute a rigid procedural threshold for the flexible equitable standard Rule 60(b)(5) actually prescribes. See *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378-84 (1992) (rejecting the "grievous wrong" gloss on Rule 60(b)(5) and adopting a flexible equitable approach); *Agostini*, 521 U.S. at 235-36 (concluding adherence to a prior decision whose underpinnings have been eroded by intervening Supreme Court precedent works a "manifest injustice").

By confining Rule 60(b)(5) to cases of active court supervision the district court acted outside the law. The limitations imposed effectively eliminated the equitable power district courts have to carve out just remedies. *See Pierce*, 518 F.2d at 722. The district court's carve-out is not based on congressional text.

28

**B. The District Court Erroneously Relied on Dicta in Cases From Other Jurisdictions Instead of This Court's Rule 60 Jurisprudence in *Repsis I*.**

This Court's decision in *Repsis I* and the follow-on decision in the district court, *Crow Tribe of Indians v. Repsis*, 2024 WL 1478580, *10 (D. Wyo. Mar. 28, 2024) ("*Repsis* II"), provide the closest guidance on the unique treaty rights involved in disestablishment cases and the effect of intervening law. The Rule 60(b)(5) analysis here mirrors *Repsis* II. There, the district court granted relief under Rule 60(b)(5), reason [iii], based on new Supreme Court precedent, citing a state court's application of that judgment as res judicata against a tribal member, as demonstrating its inequitable prospective application and emphasizing that continued wrongful denial of tribal rights is "detrimental to the public interest." *Id.* at *12.

In *Repsis I*, the Crow Tribe sought Rule 60(b) relief from a 1995 Tenth Circuit decision rejecting the treaty-created hunting rights of its members — a decision the Supreme Court later "qualified" in *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) and repudiated in *Herrera v. Wyoming*, 587 U.S. 329, 343 (2019) (finding continued application of an erroneous judgment to deny an entire tribal

29

nation's rights offends equity and harms the public interest in ways that outweigh finality). *See Repsis* I, 74 F.4th at 1210-13. The 1995 judgment was, like *Irby*, a final order dismissing the tribe's claim. No injunction. No consent decree. No continuing managerial role. The district court denied relief on the ground that it lacked authority to reconsider what the Tenth Circuit had affirmed. *Id.* at 1214. This Court reversed and remanded, directing the district court to consider the Rule 60(b) motion on the merits. *Id.* at 1219-21. On remand, the district court granted Rule 60(b)(5) relief — based on the intervening change in law, in a case with no injunction.

If the district court were right that Rule 60(b)(5) requires an active injunction, the *Repsis* cases could not have been decided as they were. *Repsis* cases presented a final order denying injunctive relief and effectively granting declaratory relief for the State — the same procedural posture as *Irby*. This Court nonetheless held that Rule 60(b) was available. *Repsis I*, 74 F.4th at 1219-22.

The district court here did not meaningfully grapple with the *Repsis cases*. It acknowledged *Repsis I*, then declined to follow it on the ground that the Tenth Circuit "did not reach the question of whether the

30

challenged order had prospective application." Doc. 172 at 4 (App. 0258).

*Repsis I* did not need to reach that question to refute the district court's

holding. *Repsis I* had to have held that Rule 60(b) is available to address

a final order denying injunctive relief, where intervening Supreme Court

precedent has undermined the legal basis for that order. *Id.* at 1219-22.

## C. The *Twelve John Does Line* of Authority is Inapposite — And, in Any Event, Non-binding.

The district court relied on three out-of-circuit decisions: *Twelve*

*John Does v. District of Columbia*, 841 F.2d 1133 (D.C. Cir. 1988)(decided

before *Agostini v. Felton*, 521 U.S. 203 (1997)); *Coltec Industries, Inc. v.*

*Hobgood*, 280 F.3d 262 (3d Cir. 2002); and *Picco v. Global Marine Drilling*

*Co.*, 900 F.2d 846 (5th Cir. 1990). Doc. 172 at 3-5 (App. 0257–0259). As

the district court itself acknowledged, "not one of these cases is binding

precedent on this Court's analysis." Doc. 172 at 4 (App. 0258).

None of this authority addresses the situation presented here.

*Twelve John Does* concerned prison litigation in which a United States

Attorney General, who was originally a defendant, had been dismissed

from the case before the remaining parties negotiated a consent decree

that he had no involvement with. The plaintiffs had not appealed the

dismissal. After repeated violations of the consent decree, the district

31

court reinstated the Attorney General as a defendant under Rule 60(b). In overruling the district court, the D.C. Circuit emphasized that the underlying judgment pursuant to the negotiated consent decree had been "satisfied" and "no longer had any prospective effect." 841 F.2d at 1138-39.

In *Coltec* the plaintiff used Rule 60(b) to ask for relief from the dismissal of an order it had agreed to. *Coltec* merely confirmed that courts generally hold that dismissals with prejudice are not prospective within the meaning of Rule 60(b)(5) and that collateral estoppel arguments are "common to all judgments." 280 F.3d at 272.

*Picco* concerned a Jones Act dismissal that "preclude[d] relitigation of the issues decided" — but, the Fifth Circuit concluded that was not enough to bring Rule 60(b)(5) into play. 900 F.2d at 851.

The *Irby* judgment is a different animal. *Irby* does not merely preclude relitigation between the Nation and the OTC over personal income tax exemptions. *Irby* operates, in perpetuity, as a categorical pronouncement that the Osage Reservation does not exist — a determination the OCCA adopted preclusively against the Nation in the major-crimes context. *McCauley*, 548 P.3d at 464. The "prospective

application" of *Irby* is not an abstract preclusive effect "common to all judgments," *Coltec*, 280 F.3d at 272. It is a continuing, daily denial of the Nation's sovereign existence on its own Reservation. That is the kind of ongoing prospective effect Rule 60(b)(5), reason [iii], was written to address. *See Horne v. Flores*, 557 U.S. 433, 447 (2009) ("[A] 'significant change in fact or law' may render continued enforcement 'detrimental to the public interest'") (citation omitted); *Agostini*, 521 U.S. at 236-37.

The Fifth Circuit reached the opposite conclusion of the D.C. and Third Circuits in *Kirksey v. City of Jackson*, 714 F.2d 42, 43 (5th Cir. 1983). *Kirksey* held that a final order dismissing a case has "prospective application" for purposes of Rule 60(b)(5), reason [iii], where the dismissal "would bar a new and independent action … reasserted on the basis of the alleged changes in controlling law." *Id.* at 43. The Fifth Circuit's statement in *Kirksey* has been criticized as over-broad in some cases, including *Twelve John Does*, 841 F.2d at 1139–40, and the district court here followed that criticism, calling *Kirksey*'s rule "dictum" and "in tension" with later decisions. But *Kirksey* states the correct rule under the plain language of Rule 60(b)(5): reason [iii] is not confined to particular forms of judgment. It applies whenever a judgment's

33

continuing preclusive effect denies a party the right to retry its claims in light of changed law — exactly the situation Oklahoma successfully invoked against an Osage defendant in *McCauley*, 548 P.3d at 464. *Kirksey*'s reasoning — that the prospective effect of a judgment turns on its real-world consequences, not on whether it bears the formal label of an "injunction" — is consistent with *Agostini* and the *Repsis* cases. This Court has never squarely adopted the narrower rule the district court relied on and it should not do so here, where the consequence would be to entrench in perpetuity a judgment that cannot be sustained in light of *McGirt*.

## D. The District Court's "Alternative Remedies" Rationale is Not a Defense to a Rule 60(b)(5) Motion.

The district court suggested that the Nation can simply file a new lawsuit and litigate the disestablishment question on a clean record. Doc. 172 at 6 (App. 0260). That suggestion misapprehends both the law and the consequences. Oklahoma successfully invoked *Irby*'s preclusive effect in *McCauley* to deny *McGirt* review to an Osage defendant. *McCauley*, 548 P.3d at 464. A new lawsuit, suggested as a remedy by OTC, Doc. 162 at 1 (App. 0222), would undoubtedly face the same preclusion argument the State made in *McCauley*. The State has every incentive to continue

to assert that *Irby* settles the question for all time and all comers and that *McGirt* is meaningless. The "alternative remedy" the district court invokes is not, in any meaningful sense, available.

More fundamentally, the availability of an alternative remedy is not a basis to deny Rule 60(b)(5) relief. Nothing in the Rule's text conditions relief on the unavailability of other procedural vehicles. The district court cited no authority for that proposition. Rule 60(b) was enacted to "supplant[] various extraordinary writs" with a "more simple and expeditious motion." *Oliver,* 157 F.2d at 152. Forcing the Nation to refile and re-litigate, knowing the State will continue to support the viability of the result in *Irby,* is not what Rule 60(b) was meant to accomplish.

## E. The District Court Applied the Wrong Legal Standard.

A district court "abuses its discretion if it bases its ruling on an erroneous view of the law." *Zurich N. Am*, 426 F.3d at 1289. The district court read into Rule 60(b)(5), reason [iii], a requirement — an "active injunction or consent decree" — that the Rule does not contain. It declined to follow this Court's controlling decision in *Repsis I*. It relied on out-of-circuit decisions that, by their own terms, do not reach the

35

situation presented here. It invoked an "alternative remedies" rationale with no textual support. Each of those is independently an error of law. Cumulatively, they are an abuse of discretion. See *Agostini*, 521 U.S. at 215 (finding the District Court abused its discretion in failing to recognize that Aguilar had been undermined); *Repsis I*, 74 F.4th at 1219. The "whole purpose" of Rule 60(b) "is to make an exception to finality." *Buck*, 580 U.S. at 126 (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 529 (2005)). Instead, the district court is strictly limiting any exceptions to finality.

## III.    THE DISTRICT COURT ABUSED ITS DISCRETION IN HOLDING THAT RULE 60(b)(6) DOES NOT AUTHORIZE RELIEF FROM A JUDGMENT BASED ON AN INTERVENING CHANGE IN GOVERNING LAW.

Rule 60(b)(6) authorizes a court "to vacate judgments whenever such action is appropriate to accomplish justice." *Klapprott v. United States*, 335 U.S. 601, 615 (1949). This Court has called it a "grand reservoir of equitable power to do justice in a particular case." *Pierce,* 518 F.2d at 722. Relief is appropriate "when it offends justice to deny such relief." *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 580 (10th Cir. 1996) The district court did not apply that standard. It instead held that "a change in case law doesn't justify vacatur under Rule 60(b)(6)" unless the underlying and intervening cases are "factually related" in the very

36

narrow sense of arising "out of the same transaction or occurrence." Doc. 172 at 6-7 (App. 0260–0261) (quoting *Elite IT*, 91 F.4th 1042, 1049). That holding misreads *Elite IT* and conflicts with *Pierce*, *Yapp*, and this Court's controlling decision in *Repsis I*.

## A. *Elite IT* Does not Require a "Same Transaction or Occurrence" Relationship Between Cases.

*Elite IT* did not announce a new rule that Rule 60(b)(6) is unavailable unless the underlying and intervening cases arise from the same nucleus of facts. *Elite IT* applied a longstanding *Pierce* principle to a particular set of facts. *Pierce* held that Rule 60(b)(6) relief is available in "extraordinary situations" — for Pierce itself, an "unusual combination of events" comprising diversity removal that forced plaintiffs into federal court, an *Erie* outcome-determination violation, and a change of controlling state law in a related state-court case. 518 F.2d at 722-23. The This Court distinguished but did not overrule *Collins v. City of Wichita*, 254 F.2d 837, 839 (10th Cir. 1958), in which the change of law had come in an unrelated case. *Id. Elite IT* in turn focused on the "same accident" facts in *Pierce*, *see Elite IT*, 91 F.4th at 1049, but *Pierce's* standard is a combination of factors, not any single one. The combination here is at least as compelling: a federal disestablishment judgment built on *Solem's*

37

methodology, the Supreme Court's intervening clarification in *McGirt* that *Solem* permits no inference of disestablishment without clear textual evidence, and the continuing preclusive use of *Irby* against Osage citizens documented in *McCauley*, 548 P.3d at 464. Rule 60(b)(6)'s "grand reservoir of equitable power" was designed for exactly this kind of extraordinary situation. *Pierce*, 518 F.2d at 722. The "factually related" language in *Elite IT* describes one circumstance in which that equitable power has been exercised; it does not limit the Rule to that circumstance alone.

The district court's narrow reading would, if accepted, gut *Repsis cases*. Yet the *Repsis* cases involved a tribal treaty case from 1995 and Supreme Court cases from 1999 and 2019. Different parties. Different treaties. Different States. Different decades. By the district court's standard, the *Repsis* cases*, Herrera,* and *Mille Lacs* could not possibly be "the same transaction or occurrence." Yet the district court in *Repsis II* held that Rule 60(b)(6) would also support vacatur based on the intervening Herrera decision, even if Rule 60(b)(5) did not. *Repsis II*, 2024 WL 1478580, at 11 ("assuming, arguendo, that (b)(5) was inapplicable, we find vacatur under (b)(6) could also provide relief."). The district court

38

here distinguished *Repsis II* on the ground that *Repsis I* and *Herrera* "dealt with the same fundamental 'transaction'—the treaty between the Crow Tribe and the United States." Doc. 172 at 7 n.5 (App. 0261). That reading drains the word "transaction" of meaning. *Herrera* did not involve the Crow Tribe as plaintiff; it involved a different Crow individual in a different State criminal prosecution years after the *Repsis* cases. And *Mille Lac* did not involve the Crow Tribe or Crow members at all. It involved hunting rights of the Chippewa. The only thing the cases shared was the same legal question — whether the treaty language concerning hunting rights survived Wyoming's admission to statehood — under the same legal framework. That is precisely the relationship *McGirt* and *Irby* share here.

## B.  *Irby* and *McGirt* Address the Same Legal Question Under the Same Legal Framework.

*Irby* and *McGirt* both apply the disestablishment framework of *Solem*, to determine whether Congress disestablished a reservation in former Indian Territory through allotment-era legislation. *McGirt*, 591 U.S. at 902-04, 909; *Irby*, 597 F.3d at 1122. Both involve federally recognized tribes whose reservations were established by treaty in the nineteenth century. Both involve allotment acts enacted near the turn of

39

the twentieth century. Both turn on the role of extratextual evidence —
historian opinions, post-enactment practices, demographic changes — in
determining congressional intent. Compare *McGirt*, 591 U.S. at 913-29
(holding extratextual evidence cannot substitute for clear textual
language), with *Irby*, 597 F.3d at 1122, 1124-27 (finding extratextual
evidence supports disestablishment despite no clear statutory language).
Beyond that shared analytical framework, *Irby* and *McGirt* are factually
related in the more specific sense *Elite IT* contemplated. *Irby* was
expressly premised on the (erroneous) understanding that the OAA, the
Creek Allotment Act (interpreted in *McGirt*), and the OEA were together
part of a coordinated congressional scheme to disestablish all Indian
reservations in Oklahoma prior to statehood. See *Irby*, 597 F.3d at 1124-
25. *McGirt* rejected that premise as to the Creek Reservation; *McGirt*
thus directly disturbs the legal and factual foundation on which *Irby* was
built. That is the relationship *Elite IT* contemplated. *See* 91 F.4th at
1049.

The district court's view that *McGirt* and *Irby* are unrelated
because they "discuss different tribes, different treaties, different acts of
Congress, and different political histories," is legally erroneous. Doc. 172

40

at 7 (App. 0261). If shared parties and statutes are required, no intervening Supreme Court precedent could ever support Rule 60(b)(6) relief. Every Supreme Court decision involves different parties from different lower-court cases. The Supreme Court's clarification of *Solem* in *McGirt* either changes the law applicable to disestablishment determinations or it does not. It plainly does — as the district court itself recognized when it acknowledged that "the legal landscape has shifted dramatically," Doc. 172 at 1 (App. 0255), and as the *McGirt* dissenters recognized. *McGirt*, 591 U.S. at 947-48 (calling the "new approach" one that sharply restricts the consideration of extratextual evidence in favor of "text"). Rule 60(b)(6) supplies the equitable mechanism to assure that a judgment based on an analytical framework that has undermined previous precedent can be vacated. *Pierce*, 518 F.2d at 722-23; *Repsis II*, 2024 WL 1478580, at *11.

## C. Whatever *Elite IT* Requires, the Equities Here Amply Meet It.

Even if *Elite IT* is read to require something more than a shared legal question, the equities here go well beyond what Rule 60(b)(6) has been held to require. The *Irby* judgment determines the Nation's sovereignty over a 1.4-million-acre territory that was initiated in the

41

nineteenth-century Osage Treaties and established by congressional acts in 1870 and 1872. It governs criminal jurisdiction under the Major Crimes Act ("MCA"), 18 U.S.C. § 1153, and the General Crimes Act ("GCA"), 18 U.S.C. § 1152. It controls the Nation's authority to combat violence against Native women under the Tribal Law and Order Act of 2010 ("TLOA"), Pub. L. No. 111-211, 124 Stat. 2258, and the Violence Against Women Reauthorization Act ("VAWA"), 25 U.S.C. § 1304. It determines the Nation's eligibility for federal programs predicated on reservation status. Reservation status is, in short, critical to fundamental issues of tribal sovereignty.

## IV.   THE *IRBY* JUDGMENT IS IRRECONCILABLE WITH *MCGIRT* AND EXCEEDED THIS COURT'S AUTHORITY.

This Court's decision in *Irby* and the Supreme Court's decision in *McGirt* cannot stand together. They apply different legal tests to the same question — whether Congress disestablished a reservation — and they reach incompatible conclusions about what evidence may support a disestablishment finding. *Irby* relied on extratextual evidence as an independent ground for finding disestablishment, after concluding that no statutory text supported it. *McGirt* held that extratextual evidence may not do that work. Worse: *McGirt* held that "[c]ourts have no proper

42

role in the adjustment of reservation borders," and that disestablishment is a power that "belongs to Congress alone." 591 U.S. at 903. A federal court that purports to disestablish a reservation without a congressional command — as *Irby* did — exceeds the judicial power Article III confers. The *Irby* judgment is not merely wrong; it exceeds federal courts' Article III authority. Rule 60(b)(6) should be able to provide relief "to vacate judgments whenever such action is appropriate to accomplish justice." *Klapprott*, 335 U.S. at 615. It is a "grand reservoir of equitable power to do justice in a particular case." *Pierce,* 518 F.2d at 722.

## A.  Irby Found no Statutory Text Supporting Disestablishment and Inferred Disestablishment From Extratextual Factors Alone.

*Irby*'s analytical structure is the key to its irreconcilability with *McGirt*. *Irby* applied a three-part test derived from *Solem*, examining (1) statutory language, (2) "surrounding circumstances," and (3) "subsequent events." 597 F.3d at 1122. This Court conducted that examination and found — explicitly — that the statutory language did not support disestablishment. This Court acknowledged that the OAA and OEA contained no express termination language. This Court recognized the OAA had multiple provisions that suggested the boundaries of the

43

Reservation were unchanged: OAA allotted the land primarily to tribal members; Allotment "is insufficient in and of itself to indicate disestablishment;" OAA authorized the Secretary to set aside lands for tribal purposes; OAA "did not directly open tribal land to non-Indian settlement. *Id.* OAA "provided no compensation to the Osage Nation, as would be expected if the Reservation was being disestablished." *Id.* at 1123-24. OAA "reserved the entire mineral estate underlying the Reservation for the Osage Nation as a whole," and "provid[ed] for a form of tribal government. " *Id.* at 1123-25.

Having found no statutory support for disestablishment, the *Irby* Court did not stop. Instead, "despite statutory language that would otherwise suggest unchanged reservation boundaries," 597 F.3d at 1122, the Court inferred disestablishment from four extratextual factors: tribal consent to allotment under "pressure," post hoc statements by historians, post hoc statements by federal officials, and post hoc demographic changes. *Id.* at 1124-27. This Court later acknowledged "we concluded Congress had disestablished the Osage Reservation, despite an absence of clear textual evidence." *Murphy,* 875 F.3d at 954, aff'd sub nom. *Sharp* 591 U.S. at 977.

## B. *McGirt* Held That What *Irby* Did Is Not Permissible.

*McGirt* was not subtle on this point. The Supreme Court held that disestablishment requires "explicit" statutory language expressing a "clear and plain" intent to disestablish a reservation. 591 U.S. at 916. "[T]here is only one place we may look: the Acts of Congress." *Id.* at 903. Extratextual sources may be consulted only "to help "clear up . . . not create" ambiguity about a statute's original meaning. *Id.* at 916. *McGirt* warned directly against the analytical move *Irby* made: "Congress remains free to … seek to pass laws that tiptoe to the edge of disestablishment and hope that judges — facing no possibility of electoral consequences themselves — will deliver the final push. But it has never done so here, and its silence is dispositive." *Id.* at 903. *Irby* delivered exactly that final push. This Court, finding no statutory language of disestablishment, performed the disestablishment itself, by judicial inference from extratextual material. That is the precise analytical error *McGirt* warned against.

## C. *Irby* Exceeded the Tenth Circuit's Article III Authority.

Federal courts are "courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Their power "is not to

45

be expanded by judicial decree." *Id*. The Constitution vests "the judicial Power of the United States" in courts established by Congress, U.S. Const. art. III, § 1, and that power does not extend to lawmaking. "Subject-matter limitations on federal jurisdiction serve institutional interests. They keep the federal courts within the bounds the Constitution and Congress have prescribed." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).

*McGirt* made these structural principles concrete in the context of reservation disestablishment. "Only Congress can divest a reservation of its land and diminish its boundaries." *McGirt,* 591 U.S. at 903 (citing *Solem,* 465 U.S. at 470). The Court continued: "[s]aving the political branches the embarrassment of disestablishing a reservation is not one of our constitutionally assigned prerogatives." *Id.* The Court was emphatic that judicial action without congressional language is not a permissible substitute for legislation: "Unlawful acts, performed long enough and with sufficient vigor, are never enough to amend the law." *Id.* at 937-38.

When this Court in *Irby* purported to disestablish the Osage Reservation without identifying any congressional language of

46

disestablishment, it acted outside the bounds Article III imposes. It exercised what the Supreme Court has called raw judicial power — the precise antithesis of the judicial role *McGirt* described. The *Irby* judgment is therefore not merely incorrect; it exceeded the federal courts' Article III authority. That kind of fundamental overreach — now made plain by *McGirt* — is precisely the "extraordinary circumstance" that Rule 60(b)(6)'s "grand reservoir of equitable power" was meant to reach. *Pierce*, 518 F.2d at 722.

That conclusion is not foreclosed by the fact that *Irby* was decided before *McGirt*. The Rule 60(b)(6) inquiry does not turn on the rendering court's good faith or its understanding of the law at the time. It turns on whether, viewed against governing law as it now stands, the equities require relief from a judgment that exceeded the court's authority. *McGirt* makes clear that no Article III court has the power to disestablish a reservation; only Congress does. *McGirt*, 591 U.S. at 903. *Irby*'s purported disestablishment was therefore beyond this Court's power, regardless of what governing law was understood to require in 2010. That overreach — clarified by *McGirt*'s holding that disestablishment "belongs

to Congress alone" — is the kind of extraordinary circumstance that justifies vacatur under Rule 60(b)(6).

## D. The *Irby* Judgment Cannot be Reconciled With *McGirt* by Limiting *McGirt* to its Facts.

Oklahoma has argued, and the OCCA in *McCauley* held, that *Irby* survives *McGirt* because the two decisions concern different tribes and different statutes. That is not how stare decisis works. The district court here believed it could not give the Nation relief under Rule 60(b)(6) even when the Supreme Court announces a new analytical framework for a recurring question that governs across all parties, statutes, and tribes — not only the question before the court. See *McGirt*, 591 U.S. at 903 (announcing the rule that "there is only one place we may look: the Acts of Congress"). The Oklahoma state courts, applying *McGirt*, have recognized the continued existence of the other Five Tribe Reservations (Cherokee, Chickasaw, Choctaw, and Seminole Reservations) and others. *See* n. 5, *supra*. Doc. 172 at 2 (App. 0256) (collecting cases). Only the Osage Nation has been denied a *McGirt* analysis — and only because *Irby* stands in the way.

*Irby* and *McGirt* address the same question, but *McGirt* announced a new and intervening analytical legal framework to answer the

48

question. *Irby*'s analytical approach, particularly its reasoning that allowed it to disestablish the Nation's Reservation solely on the basis of extratextual evidence, has, in the words of *Herrera*, been "upended" and "repudiated." 587 U.S. at 343. The *Irby* court exercised a role in disestablishing the Nation's Reservation that *McGirt* has repudiated. *Irby* must yield.

## V.   THE EQUITIES OVERWHELMINGLY FAVOR VACATUR, AND THIS COURT SHOULD REACH THE MERITS RATHER THAN REMAND.

### A. The Equities Favor Vacatur.

The Nation's sovereignty over its 1.4-million-acre Reservation is at stake. So is its ability to exercise criminal jurisdiction, to combat domestic violence against Native people and various other issues. *Irby* deprives the Nation of all of that, perpetually, on the basis of a judgment that the Supreme Court has since made clear was reached through impermissible judicial methods. The State's reliance interests cannot justify continuation of that deprivation. "[T]he magnitude of a legal wrong is no reason to perpetuate it." *McGirt*, 591 U.S. at 934. The State has had to adapt after learning that the Creek Reservation and most other tribal reservations — comprising about 43% of Oklahoma — have

49

not been disestablished. See *Castro-Huerta v. Oklahoma,* 597 U.S. 629, 646 (2022). It can adapt again.

**B. The Osage Nation is Entitled to the Same Treatment as Every Other Federally Recognized Tribe in Oklahoma.**

The Osage Nation stands alone. Most federally recognized tribes in Oklahoma whose reservation status has been litigated post-*McGirt* have had their reservations recognized as intact. *See* note 4, *supra.* There is no principled basis for treating the Osage Reservation differently. The OAA provides, if anything, more statutory protection for reservation status than the corresponding provisions affecting the Creek Nation: it reserved the entire mineral estate to the Nation as a whole, *Irby*, 597 F.3d at 1124; it reserved tribal-set-aside land authority to the Secretary, *id.* at 1123; it preserved a form of tribal government, *id.* at 1125; and it contained no compensation provision typical of disestablishment statutes, *id.* at 1124. The district court did not address this issue on the merits, but could not have found any material textual differences between the OAA and other allotment statutes that have been held to preserve reservations.

**C.  This Court Should Reach the Merits and Hold That the Osage Reservation has not Been Disestablished.**

When this Court reverses the district court's procedural rulings, it ordinarily would remand for the district court to address the merits in the first instance. The Court should not do so here. The merits question is one of statutory interpretation, reviewed de novo. *McGirt*, 591 U.S. at 902. The record contains the relevant treaties and — all of which were fully addressed by both the district court and the Tenth Circuit in the original *Irby* litigation. No factual development is needed. The Supreme Court has now provided the controlling disestablishment framework in *McGirt*. Applying that framework to the statutes already on the record requires no remand.

Further delay would perpetuate the ongoing harm to the Nation's sovereignty. Every day that *Irby* stands is a day the OCCA can — and does — invoke it to deny *McGirt* review to Osage citizens. *McCauley*, 548 P.3d at 464. Every day that *Irby* stands is a day the Nation is treated unequally with every other Oklahoma tribe. The Nation has already waited nearly six years since *McGirt* was decided; it has waited a century and a half since the 1870 Act guaranteed the Osage their "permanent

51

home." *See also* 1872 Act. There is no reason for further delay where the legal question is fully presented and capable of immediate resolution.

This Court has the power under 28 U.S.C. § 2106 to "direct the entry of such appropriate judgment, decree, or order . . ." and should exercise that power here to vacate the *Irby* judgment and to enter judgment declaring that Congress has not disestablished the Osage Reservation.

## CONCLUSION

This Court should reverse the district court's March 2, 2026 Opinion and Order, vacate the judgment in *Irby* and hold — or remand with instructions to hold — that Congress has not disestablished the Osage Reservation. In the alternative, this Court should remand for the district court to consider the Rule 60(b) motion on the merits, with instructions consistent with this Court's holding that Rule 60(b)(5), reason [iii], and Rule 60(b)(6) are available where intervening Supreme Court precedent has undermined the legal basis for a final judgment. No Court has found any language in an act of Congress disestablishing the Nation's reservation.

Respectfully submitted,

/s/ Eugene Bertman
Eugene Bertman, OBA #19406
TALLEY, TURNER, STICE &
BERTMAN
130 E. Eufaula Street
Norman, Oklahoma 73069
(405) 364-8300
gbertman@ttsblaw.com

and

/s/ Clinton Patterson
Clinton Patterson, OBA #19689
ATTORNEY GENERAL,
OSAGE NATION
813 Grandview Avenue
Pawhuska, Oklahoma 74056
(918) 287-5555
cpatterson@osagenation-nsn.gov
Counsel for Appellant Osage Nation

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 12448 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Eugene Bertman
Eugene Bertman
Counsel for Appellant Osage Nation

54

**CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2026, I electronically filed the foregoing Brief of Appellant Osage Nation with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system upon:

> Garry Gaskins, II
> Cullen D. Sweeney
> Will Flanagan
> Office of the Attorney General
> State of Oklahoma
> 313 N.E. 21st Street
> Oklahoma City, OK 73105
> Garry.Gaskins@oag.ok.gov
> Cullen.Sweeney@oag.ok.gov
> William.Flanagan@oag.ok.gov
> Counsel for Appellees/Defendants

> /s/ Eugene Bertman
> Eugene Bertman
> Counsel for Appellant Osage Nation

55

# ATTACHMENT I

# United States District Court
## for the Northern District of Oklahoma

---

Case No. 01-cv-516-JDR-MTS

---

OSAGE NATION, *a federally recognized Indian tribe,*

*Plaintiff,*

*versus*

MARK WOOD, *in his official capacity as Chairman of the Oklahoma Tax Commission;* SHELLY PAULK, *in her official capacity as Vice Chairwoman of the Oklahoma Tax Commission;* CHARLES PRATER, *in his official capacity as Secretary of the Oklahoma Tax Commission,*[1]

*Defendants.*

---

## OPINION AND ORDER

---

Twenty-five years ago, the Osage Nation sued to enjoin the Oklahoma Tax Commission from taxing the income of members of the Osage Nation who work within the historical boundaries of the Osage Reservation. Dkt. 1.[2] This Court granted summary judgment against the Osage Nation, holding that Congress disestablished the Osage Reservation when it passed the 1906 Osage Allotment Act. Dkt. 113. The Tenth Circuit upheld this Court's decision, and the Supreme Court denied certiorari. Dkts. 135, 138.

In the past fifteen years, the legal landscape has shifted dramatically. The Supreme Court recognized the continued existence of the Muscogee (Creek) Nation's reservation in *McGirt v. Oklahoma*, 591 U.S. 894 (2020), and

---

[1] Chairman Wood, Vice Chairwoman Paulk, and Secretary Prater are substituted as defendants in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

[2] All citations use CM/ECF pagination.

No. 01-cv-516

other courts, applying *McGirt*, have recognized the continued existence of the reservations of the Cherokee Nation, the Choctaw Nation, the Chickasaw Nation, and the Seminole Nation. *Hogner v. Oklahoma*, 2021 OK CR 4, ¶ 18, 500 P.3d 629, 635; *Sizemore v. Oklahoma*, 2021 OK CR 6, ¶ 8, 485 P.3d 867, 869; *Bosse v. Oklahoma*, 2021 OK CR 30, ¶ 12, 499 P.3d 771, 774; *Grayson v. Oklahoma*, 2021 OK CR 8, ¶ 11, 485 P.3d 250, 254. Despite this sea change in the law, no court has found that *McGirt*'s holding extends to the Osage Reservation, and the Oklahoma Court of Criminal Appeals has held, *McCauley v. Oklahoma*, 2024 OK CR 8, ¶ 4, 548 P.3d 461, 464, that issue preclusion bars reconsideration of this Court's prior ruling.

The Osage Nation now seeks relief from this Court's prior holding under Rules 60(b)(5) and 60(b)(6) of the Federal Rules of Civil Procedure, arguing that *McGirt* implicitly overruled this Court's prior holding. Dkt. 148. But Rule 60(b)(5) only permits relief from judgments if a district court has an ongoing managerial role in the judgment such as an active injunction or a consent decree, and Rule 60(b)(6) does not permit relief from a judgment based solely on a change in the governing law. This Court may not grant the Osage Nation relief from judgment and denies the motion.

I

To get relief from a judgment under Rule 60(b)(5), a party must show that "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Rule 60(b)(5) relief is "extraordinary" and "may only be granted in exceptional circumstances." *Mullin v. High Mountain*, 182 F. App'x 830, 832 (10th Cir. 2006).

Other courts have expressly limited the application of Rule 60(b)(5) to judgments involving "the supervision of changing conduct or conditions," or orders "compel[ling] [a party] to perform, or order[ing] [the party] not to perform, any future act[,] . . . [or] requir[ing] the court to supervise any continuing interaction between [the parties]." *Twelve John Does v. D.C.*, 841 F.2d

2

No. 01-cv-516

1133, 1139 (D.C. Cir. 1988). In general, this means that there must be some active injunction or court intervention at play. *See, e.g., In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 329 F.R.D. 151, 154 (E.D. Pa. 2018), *aff'd sub nom. Juday v. Merck & Co. Inc.*, 799 F. App'x 137 (3d Cir. 2020) (noting that "[g]enerally, Rule 60(b)(5) is invoked where injunctions have issued or consent decrees with prospective provisions have been entered" and denying relief where "[t]he judgment entered . . . simply dismissed their case [and] ended the action and imposed no future obligations on any of the parties"). The fact that a judgment results in collateral estoppel or has other preclusive effects, as all orders do, does not mean the judgment has "prospective effect" under Rule 60(b)(5). *See Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 272 (3d Cir. 2002) (holding that collateral estoppel "is common to all judgments" and rejecting it as a basis for a judgment having "prospective application"); *see also Picco v. Glob. Marine Drilling Co.*, 900 F.2d 846, 851 (5th Cir. 1990) (holding that when "the only arguably prospective effect of [a] dismissal is that it precludes relitigation of the issues decided" that prospective effect "is not enough" to permit a Rule 60(b)(5) motion).[3]

Although the cases are not explicit on this requirement, many courts have effectively narrowed the applicability of Rule 60(b)(5) to orders *granting* "injunctions or consent decrees regulating ongoing behavior." *Picco*, 900 F.2d at 851; *see also In re Jacobs*, No. 05-19032, 2008 WL 4369273, at *3 (Bankr. D. Kan. Sept. 22, 2008) (determining that while relief under 60(b)(5) could be granted to address an active injunction, it could not be used to revisit an order revoking an injunction) and *Dowell v. Board of Educ. of Oklahoma City*, 8 F.3d 1501, 1509 (10th Cir. 1993) (noting in dicta that a decision to dissolve a desegregation degree does not have the prospective effect that Rule 60(b)(5) requires). Orders denying or revoking injunctions or consent decrees do not fall

---

[3] The Fifth Circuit reached the opposite conclusion in *Kirksey v. City of Jackson*, 714 F.2d 42, 43 (5th Cir. 1983), but *Kirksey*'s discussion of Rule 60(b)(5)'s application to a final order dismissing a case was dictum and in tension with *Picco*, 900 F.2d at 851, and the holdings of other Circuits. This Court does not find *Kirksey* persuasive here.

3

No. 01-cv-516

within the ambit of Rule 60, even when those orders have preclusive effects or may be relied upon as precedent.

Of course, not one of these cases is binding precedent on this Court's analysis of whether Rule 60(b)(5) can permit revisiting a denial of injunctive relief. And, as the Osage Nation points out, the Tenth Circuit has found that a district court abused its discretion by refusing to *consider* a Rule 60(b)(5) motion in a case that, like this one, involved an order denying injunctive relief that was later called into question (but not explicitly overruled by) a subsequent Supreme Court decision. *Crow Tribe of Indians v. Repsis* ("*Repsis I*"), 74 F.4th 1208, 1219 (10th Cir. 2023). But the Tenth Circuit did not reach the question of whether the challenged order had prospective application. Instead, the Tenth Circuit limited its analysis to whether a district court may grant relief from judgment under Rule 60 when the Tenth Circuit affirmed the original judgment on grounds not originally considered by the district court. *Id.* Finding that those procedural circumstances permitted the district court to consider a Rule 60(b)(5) motion, the Tenth Circuit remanded the case to the district court without considering whether the district court's order had prospective application because that issue was only brought up at oral argument. *Id.* at 1222 n.6.[4]

## II

The Osage Nation argues that applying the Court's prior decision "prospectively [would] no longer [be] equitable" because *McGirt* has overruled it. Dkt. 149 at 50. It encourages the Court to follow the district court in *Repsis II* and grant Rule 60(b)(5) relief based on the intervening change in the law. *Id.* But this is not a case involving ongoing Court-ordered relief. In the prior proceeding, the Osage Nation moved for an injunction, and this Court

---

[4] On remand, the district court did not clearly consider whether Rule 60(b)(5) permits relief when there is no injunction, but the court acknowledged that the original holding's preclusive effect was no longer at issue before granting relief under Rule 60(b)(5). *Crow Tribe of Indians v. Repsis* ("*Repsis II*"), No. 1:92-cv-01002-ABJ, 2024 WL 1478580, at *10 (D. Wyo. Mar. 28, 2024).

No. 01-cv-516

denied the motion. Dkt. 113. The Court is no longer active in this case—there is no injunction, consent decree, or other order necessitating the Court's on-going exercise of jurisdiction. Without guidance from the Tenth Circuit on the issue, this Court elects to follow the D.C. Circuit's standard in *Twelve John Does*, 841 F.2d at 1139, and the similar holdings from the Third Circuit in *Coltec*, 280 F.3d at 272, and the Fifth Circuit in *Picco*, 900 F.2d at 851. The Court holds that the Osage Nation may not receive relief from judgment under Rule 60(b)(5) when there is no active injunction or consent decree at issue.

The Osage Nation responds that *Twelve John Does* and its ilk do not apply because this case involves issues of "sovereignty and significant public interest concerns." Dkt. 167 at 12. Although these concerns are significant, they do not implicate Rule 60. The Osage Nation does not cite any cases weighing public interest concerns as part of the Rule 60 analysis, and the only examples it supplies are those of subsequent modifications in interstate dis-putes where the Supreme Court "retain[ed] jurisdiction" because of "the need for flexibility in light of changed conditions and questions which could not be disposed of at the time of an initial decree." *Arizona v. California*, 460 U.S. 605, 624 (1983), *decision supplemented*, 466 U.S. 144 (1984). And even then, the Supreme Court characterized the ability to change their judicially managed water apportionment plan as "consistent with the role of a court of equity to modify an injunction in adaptation to changed conditions." *Id.* at 624-25 (quotation marks removed). But the Supreme Court's ability to mod-ify its existing injunction does not implicate a district court's ability to recon-sider a prior denial of injunctive relief under Rule 60. *Arizona v. California* is inapplicable here.

And much like the Supreme Court in *Arizona v. California*, the Court observes that if it were to grant the Osage Nation's requested relief, it would be effectively opening the floodgates to reopening litigation whenever its or-ders have ongoing preclusive effects, which they nearly always do. *Id.* at 625.

5

No. 01-cv-516

That state of affairs would be untenable—after all, that would imply that "*any* order that precludes relitigation of a claim" would be subject to a Rule 60(b)(5) motion whenever the law changed and "any final order or judgment on the merits could potentially be reopened under Rule 60(b)." *Twelve John Does*, 841 F.2d at 1140 (emphasis in original).

The Osage Nation argues it cannot seek relief by any other means, but this is plainly untrue. Dkt. 167 at 10. "If litigation seeking an injunction is dismissed or dissolved because current circumstances do not warrant an injunction, that determination does not preclude later litigation seeking an injunction on the basis of new or changed circumstances." 12 James Wm. Moore et al., Moore's Federal Practice § 60.47[e] (3d ed. 2026). There is nothing to preclude the Osage Nation from filing a new iteration of its original suit and arguing that this Court's prior precedent is no longer good law. If that case were to be dismissed, that dismissal would be appealable to the Tenth Circuit and, ultimately, the United States Supreme Court, both of which have the power to overturn this Court's prior decision. The Court is not swayed by arguments that Rule 60(b)(5) is necessary to cure the effects of a judgment that is allegedly no longer based on good law when there are alternatives available to a litigant.

## III

The Osage Nation also moves for relief under Rule 60(b)(6), which permits relief "for any other reason" that justifies it. The Osage Nation argues that this court's prior judgment hampers its ability to exercise its sovereignty, and places it in a unique position among the other native nations of Oklahoma—it filed its case without the benefit of *McGirt*, and so now is precluded from defending its sovereign interests to the reservation promised by Congress in the 1872 treaty. Dkt. 149 at 56-57; Dkt. 167 at 13-14.

But as Defendants point out, the Tenth Circuit has narrowed Rule 60(b)(6)'s range. Dkt. 162 at 9. The Tenth Circuit has held that "a change in case law doesn't justify vacatur under Rule 60(b)(6)" except where the

6

No. 01-cv-516

underlying and intervening cases are "factually related." *Federal Trade Commission v. Elite IT Partners, Inc.*, 91 F.4th 1042, 1049 (10th Cir. 2024).

The Osage Nation argues that *McGirt* is factually related to this case because both *McGirt* and the Court's previous decision in this case involve the application of *Solem v. Bartlett*, 465 U.S. 463 (1984) to the case of an Indian reservation in the former Indian Territory subject to an allotment act before Oklahoma statehood. Dkt. 167 at 13-14. But *Elite IT* uses a narrower definition of "factually related," which it defines as when two cases arise "out of the same transaction or occurrence." 91 F.4th at 1049 (citing *Pierce v. Cook & Co.*, 518 F.2d 720, 722 (10th Cir. 1975) for the proposition that when a single car accident led to two separate suits, a clarification of state law in one case could support Rule 60(b)(6) relief in the other).

That is not the relationship between this case and *McGirt*. The two proceedings discuss different tribes, different treaties, different acts of Congress, and different political histories. *Compare McGirt*, 591 U.S. 894, *with* Dkts. 113, 135. They do not arise "out of the same transaction or occurrence." *Elite IT*, 91 F.4th at 1049.[5] *McGirt*'s holding, therefore, does not provide the basis for Rule 60(b)(6) relief. Congress allotted the reservations of the Muscogee (Creek) Nation and the Osage Nation in separate acts; *Elite IT* bars Rule 60(b)(6) relief based on *McGirt*.

The Osage Nation argues that the standard in *Elite IT* is flawed because it has no basis in the text of Rule 60(b)(6). Dkt. 167 at 8-9. Whatever the merits of this argument may be, the Court will not address them because this Court may not overrule Tenth Circuit decisions.

---

[5] The Court recognizes that the district court in *Repsis II* found that Rule 60(b)(6) relief could be granted to the Crow Tribe based on the Supreme Court's decision in *Herrera v. Wyoming*, 587 U.S. 329 (2019). *Repsis II*, 2024 WL 1478580, at *11. But *Repsis* and *Herrera* dealt with the same fundamental "transaction"—the treaty between the Crow Tribe and the United States. *Id.*

No. 01-cv-516

## IV

For the reasons set forth above, the Osage Nation's motion for relief from judgment under Rule 60(b) [Dkt. 148] is denied as procedurally improper. The Court need not, and does not, reach the merits of the Osage Nation's argument.

DATED this 2d day of March 2026.

JOHN D. RUSSELL
*United States District Judge*